**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Brotherhood of Locomotive Engineers and Trainmen, General Committees of Adjustment for the Central Region, Northern Region, Western Region, Western Lines, Southern Region, and Eastern District; | ) | Case No. 24-cv-4810 |
| Plaintiffs, | ) | Hon. John F. Kness |
| v. | ) | |
| Union Pacific Railroad Co., | ) | |
| Defendant. | ) | |

**SECOND AMENDED COMPLAINT**[1]

1. This Second Amended Complaint presents claims on the continuing dispute surrounding Union Pacific's strategic non-compliance with both its existing agreements and the requirements of the Railway Labor Act arising from the implementation of the Parties' collectively bargained labor agreements.

2. To summarize the remaining claims—Union Pacific has contractually promised to maintain its vacancy procedures but in the course of implementing the Parties' 11/4 Agreement, has conducted a series of ongoing unilateral changes to those vacancy procedures.

3. The contractual basis for requiring Union Pacific to maintain its vacancy procedures is the January 27, 2025, agreement made by the Parties to resolve this suit, as set forth herein, and also three older agreements held by three of the Plaintiffs. Union Pacific is abrogating each of those agreements.

4. The unilateral change Union Pacific is making is modifying the final step in the

[1] This document was prepared by tracking changes in MSWord from the First Amended Complaint. The "clean" copy was filed by accepting all changes indicated in this document, with minor formatting changes to clean it up from a "redline" copy to a "clean" copy.

process for filling an engineer vacancy. The prior rule that the Plaintiffs seek to maintain did not require an engineer to accept the work assignment at this final step. Instead, the relevant vacancy procedure language stated either "acceptance [of the assignment] is not required" (meaning no acceptance is required) or "acceptance [of the assignment] required if contacted" (meaning acceptance is required *if the engineer answers the phone*). But Union Pacific is unilaterally changing the language in those vacancy procedures to say "acceptance is required."

## Facts

***The "11/4 Agreement" and Original Complaint***

5. Union Pacific made an agreement with the Plaintiffs, a group of affiliated Labor Unions, that dramatically changed work-rest cycles for the engineers who operate Union Pacific's trains. That Agreement (the "11/4 Agreement") is attached as **Exhibit A**.

6. The 11/4 Agreement materially provided that engineers represented by the Plaintiffs would for the first time have a predictable work-rest cycle involving being available to work for eleven days straight, followed by four days of uninterrupted rest.

7. Plaintiffs' first complaint in this action challenged an abrogation of that agreement involving how engineers returning to work from rest would be placed on the list of available active engineers. That issue was voluntarily resolved when Union Pacific agreed to place "engineers at the bottom of the board after observing the rest cycle," exactly as the Plaintiffs had sued to require.

***The First Amended Complaint—Implementation of the 11/4 Agreement and Cross Protection***

8. Plaintiffs' first amended complaint involved another issue arising from the implementation of the 11/4 Agreement—how "service" would be protected when absences or vacancies arose.

9. Prior to the 11/4 Agreement, trains were operated by engineers (this is "service") from two pools of labor. These labor pools are variously called a "board" or a "pool."

10. Any train would normally be covered by the engineer whose "turn" it was to work the next train. This would the "regular pool."

11. But to cover service in cases of absence, sickness, and the like, there was also a second board, called the "extra board."

12. So, if the engineer whose turn was up on the regular pool was absent or sick, Union Pacific would call the engineer from the extra board to operate the train.

13. This changed with the 11/4 Agreement.

14. Materially, the 11/4 Agreement provides that instead of maintaining these two distinct boards, they would be combined into one "board" to cover service. **Exhibit A**, Art. I.B.1 ("Home terminal pool freight service boards (new and existing) will be combined with the protecting extra board(s) into a single operation utilizing made-up turns on two boards") and Art. I.B.2.a ("The work/rest board will include work groups consisting of engineers available to provide full protection of service while other engineers are observing a rest cycle.").

15. In the course of implementing the 11/4 Agreement, which it failed to timely do as contractually promised, Union Pacific sought to modify the 11/4 Agreement in terms of which of the new combined 11/4 work/rest board would "protect" each other in the absence of the old extra boards that no longer existed.

16. In their First Amended Complaint, the Plaintiffs maintained that Union Pacific was holding out from implementing the 11/4 Agreement – which it was contractually obligated to implement by June 30, 2024 – in order to gain concessions in the form of having certain 11/4 boards "cross protect" each other. *See* First Amended Complaint, ¶¶ 11-12; 60-61; 68-69; and 85-92.

17. Such cross protection would be contrary to the terms of the 11/4 Agreement, and by holding out for those changes to the Agreement before implementing it, Union Pacific violated

Section 2 of the Railway Labor Act by trying to change the 11/4 Agreement outside of the procedures of Section 6 of the Railway Labor Act, and by failing to maintain the 11/4 Agreement as-is.

***The Parties' January 27, 2025 Agreement***

18. As this case progressed, and as the Parties were awaiting a ruling on discovery, they reached an agreement to resolve the case, which they memorialized in a signed labor agreement on January 27, 2025. **Exhibit B** (the "January 27 Agreement").

19. The impact of the January 27 Agreement was that the Parties had time to fine-tune the issue of cross-protection within the framework of the binding terms of the 11/4 Agreement, and also resolve some other differences.

20. However, and critically for this Second Amended Complaint, in the January 27 Agreement, Union Pacific agreed to maintain the status quo for "vacancy procedures." That agreement states as ¶ 1.a.ii ("Cross Protect Dispute"):

> Post-implementation vacancy procedures will reflect existing agreement or practices in place prior to the implementation of the 11/4 Agreement on a particular territory. To the extent that any secondary source was required to accept calls, employees from that secondary source will be required to accept calls post-implementation. Acceptance is required whether the post-implementation secondary source remains a stand alone board or is ultimately included in an 11/4 work group, in which case all members of the post-implementation work-group will be required to accept calls.

21. What this means is that the status quo remains for "vacancy procedures" and once boards are merged as part of implementing the 11/4 Agreement, any "merged" board will be required to "protect" any of the new "merged" boards containing a prior board that was protected. But a "merged" board cannot be required to protect a new board that it did not previously protect.

***<u>The Current Dispute over Changes to Vacancy Procedures</u>***

22. Under the January 27 Agreement, the Plaintiffs were to dismiss the case "upon completion of implementation" by July 31, 2025.

23. However, the Plaintiffs maintained "implementation" had not been completed

because Union Pacific began changing its "vacancy procedures" in direct violation of its promise in the January 27 Agreement to maintain existing vacancy procedures.

24. Union Pacific made these changes in one small but meaningful place in the vacancy procedures.

25. On the Union Pacific system, there are "Vacancy Decision Rules," that are essentially a process chart for filling a vacancy at a specific location.

26. At any specific location, the last of these "rules" arises "when manual intervention required," which means when Union Pacific has gone through all the other steps and still has a vacancy it needs to fill. Usually, this involves a person from Union Pacific's Crew Management System ("CMS") calling engineers on the phone. This process has existed for decades.

27. However, and critical for this Second Amended Complaint, across significant portions of the Plaintiffs' territories, *prior to the signing of the January 27 Agreement*, this last "manual intervention" step in filling a vacancy *did not require the engineer to accept the assignment*, contrary to the terms unilaterally, newly, and unlawfully imposed by Union Pacific.

28. There are two contractual grounds for the Plaintiffs' position.

29. *First*, the January 27 Agreement unambiguously provides that "post implementation vacancy procedures will reflect existing agreements or practices in place prior to the implementation of the 11/4 Agreement on a particular territory…[.]"

30. By unilaterally modifying the vacancy procedures (literally in writing) set out in the various "vacancy decision rules" – *in any way* – but particularly by changing them to require acceptance of the call where no acceptance was required before, Union Pacific has abrogated the terms of the January 27 Agreement in violation of the Railway Labor Act.

31. *Second*, there are older labor agreements between some of the Parties that require Union Pacific to bargain over any change to the vacancy procedures.

32. Attached as **Exhibit C**, is the relevant agreement with Plaintiff General Committee of Adjustment for the Central Region. That agreement requires that changes to the vacancy procedures must be negotiated, after due notice, and states:

> CMS personnel and Local Chairman or Chairmen on each seniority district will meet for the purpose of reviewing procedures for filling vacancies. These procedures will be incorporated in a manual to be used by CMS crew callers and will conform to existing schedule rules, local agreements, practices and understandings. Thereafter, the parties will promptly confer at the request of either party to discuss appropriate changes in the procedures which may be mutually beneficial.

33. The same provision applies to Plaintiff General Committee of Adjustment for the Southern Region (agreement attached as **Exhibit D**), with the relevant contract language stating:

> CMS personnel and Local Chairman or Chairmen on each seniority district will meet for the purpose of reviewing procedures for filling vacancies. These procedures will be incorporated in a manual to be used by CMS crew callers and will conform to existing schedule rules, local agreements, practices and understandings. Thereafter, the parties will promptly confer at the request of either party to discuss appropriate changes in the procedures which may be mutually beneficial.

34. A similar contract exists between Union Pacific and Plaintiff General Committee of Adjustment for the Eastern Region (attached as **Exhibit E**), with the relevant contract language stating:

> A. Vacancy Procedures/Decision Table
>
> > 1. The VP/DT's will be in line with the current CBA's for each location. If a dispute arises over an interpretation of the CBA for a VP/DT it will be given to the General Chairman and the Director of Labor Relations for handling. If no resolution is found, it will be sent to arbitration for a final resolution.
> >
> > 2. When a new VP/DT is required, The Local Chairman and CMS will strive to develop a VP/DT to suit the needs of the new board. The new VP/DT will then be forwarded on to the General Chairman and Director of Labor Relations for final approval.

35. There are not similar agreements between the Union Pacific and the other three Plaintiffs, *however*, all Plaintiffs are covered by the status quo agreement in the January 27

Agreement. Because of this, in order to change any of the vacancy decision rules applicable to any of the Plaintiffs (or their members) Union Pacific must bargain for those changes pursuant to the process set out in the Railway Labor Act and not make changes by unilateral action, and in doing so fail to "maintain" agreements and also to change existing agreements outside the process set forth in Section 6 of the Railway Labor Act.

36. Furthermore, Union Pacific has not only made these actions unilaterally, but without even notice to the Plaintiffs as a precursor to bargaining, which would further abrogate the specific agreements with the General Committees on for the Eastern, Southern, and Central Regions.

37. Plaintiffs have taken steps to monitor the changes made from time-to-time by Union Pacific to these vacancy procedures, but does not have ongoing access to these documents, all of which are in the custody and control of Union Pacific.

38. Union Pacific has been making these changes throughout 2025 and 2026, and the Plaintiffs have been consistently and persistently objecting.

39. For example, the General Chairman of the Eastern Region has had ongoing discussions with Union Pacific over this issue including on August 7, 2025 (**Exhibit F**). In that August 7, 2025, letter, the General Chairman for the Southern Region detailed the dispute to his Union Pacific counterpart:

> During the implementation of the San Antonio and DFW Hubs, as well as the remaining boards in the Houston and Longview Hubs, the Carrier employed new technology to implement the 11/4 boards as "RE" boards rather than the previously used "XE" boards. The Organization identified that the new decision tables ("vacancy procedures") for these 11/4 boards included a significant change in the final step for manual intervention, stating "ACCEPTANCE IS REQUIRED" which was a substantial deviation from the previous vacancy procedures.
>
> Prior to the 11/4 implementation, the same boards contained language such as "ACCEPTANCE NOT REQUIRED" or "ACCEPTANCE IS REQUIRED IF CONTACTED" for manual intervention. When I raised this issue with CMS, Brandon Bell acknowledged it as a known programming glitch and assured me that no engineers

> would be laid off due to a missed or refused call. However, I have received reports that crew callers are leaving messages suggesting that engineers will be laid off for refusing or missing a call. As a result, some engineers are accepting calls out of fear of discipline or attendance violations, even when they do not stand for the call. With the current conversion of the original 11/4 "XE" boards to the new "RE" format, I am concerned that this vacancy procedure issue will persist.

40. The presence of this issue (across the Plaintiffs and not just within the Southern Region) is what led the Plaintiffs to file their report with the Court in August 2025 explaining why they were not dismissing the case.

41. The General Chairman for the Southern Region followed up again on October 20, 2025 (**Exhibit G**) and again on November 2, 2025 (**Exhibit H**), writing:

> I am writing once again regarding the ongoing issues with vacancy procedures and the continued mishandling of locomotive engineers by CMS. Unfortunately, this matter has become a recurring problem, one that increasingly feels like a broken record. Despite numerous discussions, written correspondence outlining these grievances, and repeated assurances that corrective action would be taken, the same issues persist. It has been less than two weeks since my previous letter of October 20 addressing this very concern.
>
> The week before last, we spoke, and you appeared somewhat taken aback when you indicated that you had been led to believe that a prior missed call incident, one that occurred before the missed call event prompting my October 20 letter, had been addressed by CMS. You told me that you understood the CMS employees involved would be counseled regarding their actions and that this type of incident should not happen again. Yet, it did. Either those counseling sessions never occurred, or CMS has chosen to disregard both Labor Relations' direction and the requirements of our collective bargaining agreements, as these issues are occurring more frequently. In my view, there is an easy fix: instructing CMS to comply with the collective bargaining agreements and resolve the issue permanently, rather than continuing to rely on employee counseling that has proven ineffective.
>
> I must again express my concern regarding CMS's continued assertions that an engineer would not be placed in missed call or refused call status in connection with the disputed vacancy procedure rules. Despite repeated assurances that such actions would not occur, CMS has once again done exactly that, on four separate occasions within just the past two days, rendering their assurances nothing more than a smokescreen. Their actions continue to speak far louder than their words.

42. Each of the Plaintiffs has had similar or identical experiences with their vacancy procedures being unilaterally changed by Union Pacific without notice.

43. Each of the Plaintiffs have consistently and persistently objected to these changes as they learn of them, even while trying to handle the dispute in discussions with their counterparts.

44. Literally hundreds of engineers are available to offer sworn testimony, by declaration or live testimony, to document and prove-up this change in the vacancy procedures.

45. Unfortunately, as evidenced by Exhibits F-H, even when Union Pacific, by one its agents, "fixes" the issue, the same problem pops up again.

46. At times, this appears to change based on the specific location of the dispute.

47. At other times, it is unclear as to the reason for the changes.

48. At other times, Union Pacific does not fix the issue.

49. While the Plaintiffs have spent significant efforts to achieve the basic goal of holding Union Pacific to its promise to maintain the vacancy procedures, to correct all the vacancy procedures it has changed, and to cease threatening its members with discipline for refusing to accept an assignment they are not contractually obligated to take, those efforts have had inadequate results.

50. That is why the Plaintiffs proceed in federal court on this Major Dispute.

**Parties**

51. Plaintiffs are divisions of the Brotherhood of Locomotive Engineers and Trainmen ("BLET"), a labor organization representing the craft of engineers employed by Defendant and include the following General Committees of Adjustment: Central Region, Western Region, Northern Region, Eastern District, Western Lines, and Southern Region.

52. Defendant Union Pacific Railroad Co. is a Class I Rail Carrier that operates in this judicial district.

**Jurisdiction and Venue**

53. The Court's jurisdiction over both the Major Dispute and the breach of contract is secure under 28 U.S.C. Sec. 1331 for claims "arising under" the laws of the United States, in this

case the Railway Labor Act and agreements made under its authority. Venue is proper as Union Pacific has rail operations within this judicial district.

**Count I: Major Dispute, Change in Working Conditions and Abrogation of Contracts**

54. Plaintiff incorporates ¶¶ 1-53.

55. By unilaterally changing its vacancy procedures, as set forth above, Union Pacific has abrogated existing labor agreements with the Plaintiffs in violation of Section 2 of the Railway Labor Act and created a Major Dispute under the Railway Labor Act.

WHEREFORE, Plaintiffs pray this Court:

A. Enjoin Union Pacific from unilaterally changing its vacancy procedures, including all "vacancy decision rules;"

B. Order Union Pacific to revert all its "vacancy decision rules" to their status prior to the implementation of the 11/4 Agreement, consistent with the January 27 Agreement;

C. Enjoin Union Pacific and its agents and privies from threatening the Plaintiffs' members with discipline for refusing to accept an assignment under the "manual intervention" stage of the "vacancy decision rules;"

D. Declare this violation to be a Major Dispute within the meaning of the Railway Labor Act; and

E. Award them all other relief appropriate in law or equity.

Date: August 28, 2026

By: <u>/s/ *Michael Persoon*</u>
Michael Persoon

Michael Persoon
Michael Persoon, P.C.
517 N. Harvey Ave.
Oak Park, Illinois 60302
mike@persoonlaw.com
Cell: (312) 399-5481
Ph: (312) 952-8985